## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**SHANE HOLMES,**

        **Plaintiff,**        :

                     **Case No. 2:22-cv-1694**

    **v.**                     **Chief Judge Sarah D. Morrison**
                     **Magistrate Judge Elizabeth**
                     **Preston Deavers**

**KE GUTRIDGE, LLC, *et al.*,**    :

        **Defendants.**

## **OPINION AND ORDER**

Shane Holmes brings this action against KE Gutridge, LLC ("KEG") and Nick McGovern alleging that they fired him for absences he took for his own injury and to care for his mother and daughter.[1] Mr. Holmes and Defendants filed cross-motions for summary judgment (ECF Nos. 77, 80), both motions are fully briefed and ripe for consideration.[2] For the reasons below, Defendants' Motion for Partial Summary Judgment (ECF No. 80) is **DENIED**, and Holmes's Motion for Partial Summary Judgment (ECF No. 77) is **GRANTED in part** and **DENIED in part**.

---

[1] Mr. Holmes filed a Notice that he accepted Defendants' offer of judgment pursuant to Federal Rule of Civil Procedure 68(a) in the amount of $40,000 plus attorneys' fees on Claims 6, 7, 8, 9, and 10 of his Second Amended Complaint for alleged violations of the FLSA and Ohio law. (Pl.'s Notice Accepting Offer of Judgment, ECF No. 65.) The Court **ACCEPTS** Plaintiff's Notice (ECF No. 65) and hereby enters judgment against Defendants on Claims 6, 7, 8, 9, and 10.

[2] Mr. Holmes's Motion for Leave to File a Sur-Reply (ECF No. 88) and Motion to Consider Supplemental Authority (ECF No. 90) are **GRANTED**.

1

## I.     BACKGROUND

### A.     Mr. Holmes's Employment with Defendants

Mr. Holmes began his employment with KEG in April 2018 when it purchased his former employer Fire Guard, LLC and kept him on as an employee in the Fire Division. (S. Holmes Decl., ECF No. 84-1, PAGEID # 3973.) Mr. Holmes typically worked 60 to 80 hours per week installing fire suppression systems. (*Id.* at PAGEID # 3974.) Mr. McGovern was Mr. Holmes's supervisor. (*Id.* at PAGEID # 3973.) Mr. McGovern fired Mr. Holmes on May 15, 2020. (*Id.* at PAGEID # 3984.)

### B.     KEG's Leave of Absence Policies

KEG has different policies for requesting time off depending on whether the request was for a foreseeable or an unexpected absence. Approved foreseeable absences were "excused" and not subject to discipline. (KEG Dep., ECF No. 73, PAGEID #1464.)

For unforeseeable absences, employees had to notify both their direct supervisor and an automated call-off line checked each day by Kyle Edwards (an employee in KEG's human resources department). (*Id.* at PAGEID # 1454–56.) There is conflicting evidence on when an employee's unforeseeable absence could be considered excused. KEG's 30(b)(6) representative Tarah Wilson says that the company had an unwritten policy that an employee needed to call off less than 24 hours before the absence for it to be excused. (*Id.* at PAGEID # 1466.) However, KEG's employee handbook "Attendance and Punctuality" policy instructs: "[i]f you are going to be late for work or absent, notify your immediate supervisor as far in

2

advance as is feasible under the circumstances, but before the start of your workday." (KEG Employee Handbook, ECF No. 69-2, PAGEID # 746.) Mr. McGovern says that an employee complied with the handbook policy even if he notified KEG one minute before the start of his shift. (McGovern Dep. I, ECF No. 69, PAGEID # 514.) Defendants' summary judgment briefing also says that an absence was excused even when the employee did not call off in advance if he provided a doctor's note for the absence. (Defs.' Mot., PAGEID # 2673.)

Many of the former Fire Guard employees, including Mr. Holmes, continued to follow the Fire Guard practice of notifying Mr. McGovern and Ms. Mapes of absences for medical reasons. (KEG Dep., PAGEID # 1480–82; S. Holmes Dec., PAGEID # 3975.) If Ms. Mapes thought documentation of the absence needed to be included in an employee's file so that KEG could determine whether it was excused or unexcused, she would forward it to Mr. Edwards and Shelly Gutridge in KEG's human resources department. (KEG Dep., PAGEID # 1482–83; Mapes Dep., ECF No. 70-13, PAGEID # 1228.)

KEG had a policy providing for progressive discipline of employees incurring unexcused absences and tardies: (1) for a first offense, a verbal reprimand; (2) for a second offense, written reprimand; (3) for a third offense, suspension; and (4) for a fourth offense, termination. (KEG Dep., PAGEID # 1452–54; KEG Employee Handbook, PAGEID # 716–7.)

### C.    KEG's FMLA Procedure

When an employee submitted a request for a medical absence, Mr. Edwards

and Ms. Gutridge evaluated the request to determine if it was FMLA-qualifying. (KEG Dep., PAGEID # 1457–63, 1483–84.) If they determined that the absence qualified as FMLA leave, they would so designate it and would provide medical certification paperwork to the employee. (*Id.* at PAGEID # 1463.) If they needed more information to make a determination, they would follow up with the employee. (*Id.* at PAGEID # 1461–62.)

### D.    Mr. Holmes's Absences

Between December 2019 and his termination date, Mr. Holmes called off work 24 times. Four of those absences were dates when he called off before the start of his shift for his own illness (January 21, and April 1 through 3, 2020). (S. Holmes Decl., PAGEID # 3980, 3983–84.)

He asserts that the remaining 20 absences were FMLA-protected because he suffered a work-related injury and he was helping his ill family members. But KEG neither designated his absences as FMLA-leave nor investigated to determine whether the absences were FMLA-qualifying. (KEG Dep., PAGEID # 1495–96.)

### 1.    December 3, 2019

On the evening of December 2, Mr. Holmes took his daughter A.H. to the hospital because she was experiencing back, shoulder, neck, and joint pain and psoriasis. (A.H. Medical Records, ECF No. 77-5, PAGEID # 1867–69; S. Holmes Decl., PAGEID # 3975; A.H. Decl., ECF No. 84-2, PAGEID # 3989.) She was briefly admitted before she was evaluated and referred for a follow-up appointment with a rheumatology clinic for suspected rheumatoid arthritis. (A.H. Medical Records, ECF

4

No. 77-5, PAGEID # 1867–1869; S. Holmes Decl., PAGEID # 3975; A.H. Decl., ECF No. 84-2, PAGEID # 3989.) Even after they went home, A.H. continued to experience pain throughout the night and the next day, so Mr. Holmes stayed home to take care of her. (S. Holmes Decl., PAGEID # 3976; A.H. Decl., PAGEID # 3990.)

Mr. Holmes texted Mr. McGovern and Ms. Mapes before his December 3 shift that he was not going to be in that day because he had been in the hospital with his daughter, then had been up most of the night with her. (ECF No. 77-9, PAGEID # 2339; ECF No. 77-10, PAGEID # 2341.) Mr. Holmes says that he spoke with Mr. McGovern and Ms. Mapes after he sent the texts and explained to them that he was taking the day off to take care of his daughter who was in severe pain that the doctors believed was rheumatoid arthritis. (S. Holmes Decl., PAGEID # 3976.)

### 2. December 4 and 5, 2019

On December 4, 2019, Mr. Holmes's mother Lucille Holmes was taken to the hospital for a suspected heart attack and was told she needed a stent to unblock one of her arteries. (*See* L. Holmes Medical Rec., ECF No. 77-11; L. Holmes Decl., ECF No. 84-3, PAGEID # 3996.) Mr. Holmes visited his mother at the hospital on December 4 and 5, spoke with her doctors about her care, and helped her decide what treatment to accept. (L. Holmes Decl., PAGEID # 3996–97; S. Holmes Decl., PAGEID # 3976–77.) He provided her emotional comfort and support on the days he visited. (L. Holmes Decl., PAGEID # 3996–97; S. Holmes Decl., PAGEID # 3977.)

Mr. Holmes texted Mr. McGovern and Ms. Mapes before his December 4 shift that he was not going to be in that day because his mom had a heart attack and was

5

in the hospital. (ECF No. 77-9, PAGEID # 2339; ECF No. 77-10, PAGEID # 2342.)
He says he also spoke with both of them after sending the texts to explain his
mother's hospitalization. (S. Holmes Decl., PAGEID # 3977.)

Mr. Holmes also texted Ms. Mapes prior to his December 5 shift that he was
not going to be in that day. (ECF No. 77-10, PAGEID # 2344.) He says that he called
Mr. McGovern to explain his absence. (S. Holmes Decl., PAGEID # 3977.) Mr.
McGovern denies having any verbal conversations with Mr. Holmes about his
mother. (McGovern Dep. I, PAGEID # 580.)

### 3.    December 18 and 24, 2019

On December 18, 2019, Mr. Holmes took A.H. to her follow-up appointment
with the rheumatologist. (A.H. Medical Rec., PAGEID # 1886; S. Holmes Decl.,
PAGEID # 3978, A.H. Decl., PAGEID # 3990.) During this appointment, the
rheumatologist noted that A.H. was "being seen for worsening joint pain
particularly in her cervical spine and back," that she played softball but has had
trouble participating in gym and basketball, and that her school attendance was
"[v]ery good" but that she had missed school due to pain. (A.H. Medical Rec.,
PAGEID # 1883–86.) The rheumatologist believed A.H. likely had Juvenile
Idiopathic Arthritis–psoriatic type with active psoriasis ("JIA"). (A.H. Medical Rec.,
PAGEID # 1886.) JIA is "an umbrella-term used to describe a group of conditions
associated with chronic inflammatory arthritis in children" and it is "an
autoimmune disorder, meaning the body's own immune system is attacking healthy
cells and tissues in the joints and sometimes other parts of the body." (*Id.* at

6

PAGEID # 1935.)

The rheumatologist prescribed prednisone and weekly methotrexate injections for A.H., and told Mr. Holmes that he needed to monitor her if she became sick because methotrexate is an immunosuppressant. (S. Holmes Decl., PAGEID # 3978, A.H. Decl., PAGEID # 3990.) The rheumatology clinic gave Mr. Holmes a doctor's excuse stating that A.H. was seen in the clinic on December 18, that Mr. Holmes brought her to the visit, and that she could return to school on December 19. (ECF No. 77-15, PAGEID # 2584.)

On December 24, 2019, Mr. Holmes attended another rheumatologist appointment with A.H. to learn how to administer the methotrexate injections. (S. Holmes Decl., PAGEID # 3979; A.H. Decl., PAGEID # 3990.) The injections made A.H. sick so Mr. Holmes needed to take care of her that day. (A.H., PAGEID # 3990.) The rheumatology clinic gave Mr. Holmes a doctor's excuse for the December 24 appointment stating that Mr. Holmes was with A.H. while she was at the clinic and that he could return to work on December 26. (ECF No. 77-16, PAGEID # 2586.)

Mr. Holmes had requested time off in advance for the December 18 and 24 appointments and Defendants approved both as excused absences. (S. Holmes, PAGEID # 3978-79.) After the appointments, Mr. Holmes gave the doctor's excuses to Ms. Mapes. (ECF No. 77-15, PAGEID # 2584; ECF No. 77-16, PAGEID # 2586.) Mr. Holmes also says he explained to Mr. McGovern and Ms. Mapes the reasons for these absences. (*Id.*) However, Mr. McGovern denies having any verbal

7

conversations with Mr. Holmes about A.H. and says that he knew nothing about her. (McGovern Dep. I, ECF No. 69, PAGEID # 539, 580.) Ms. Mapes also says that she never spoke with Mr. Holmes about his daughter. (Mapes Dep., PAGEID # 3850.) Ms. Wilson testified that KEG was not aware A.H. had JIA. (KEG Dep., PAGEID # 1502.)

### 4.  January 22 through January 24, 2020

On January 22, 2020, Mr. Holmes took A.H. to a rheumatologist appointment that caused her to miss school. (A.H. Medical Rec., PAGEID # 1929; S. Holmes Decl., PAGEID # 3980; A.H. Decl., PAGEID # 3991.) She was officially diagnosed with JIA at this appointment. (*Id.* at PAGEID # 1933.)

Mr. Holmes had requested time off in advance of the January 22 appointment and Defendants approved it as an excused absence. (S. Holmes Decl., PAGEID # 3981.) On the day of the appointment, he texted Mr. McGovern and Ms. Mapes to remind them that he had scheduled the day off for his daughter's doctor's appointment. (ECF No. 77-17, PAGEID # 2588; ECF No. 77-18, PAGEID # 2593.) He provided a doctor's excuse to Ms. Mapes after the appointment. (ECF No. 77-19, PAGEID # 2600.)

Before the start of his shift on January 23, Mr. Holmes texted Mr. McGovern that he had gone to urgent care because he was sick and he was told that his illness could turn into pneumonia; he informed Mr. McGovern he was going to take one more day off because he could not get his daughter sick "with her immune system being down from her medication." (ECF No. 77-17, PAGEID # 2589.) He also texted

8

Ms. Mapes that he was not going to make it that day because he was still sick and asked to use paid time off. (ECF No. 77-18, PAGEID # 2593.)

On January 24, 2020, Mr. Holmes called off again via text to Mr. McGovern and Ms. Mapes before his January 24 shift, saying that A.H. was now sick and her doctor had instructed him to monitor her at home and to take her to the emergency room if her illness worsened. (S. Holmes Decl., ECF No. 84-1; A.H. Decl., PAGEID # 3991; ECF No. 77-17, PAGEID # 2589; ECF No. 77-18, PAGEID # 2595.)

### 5. February 13 through 21, 2020

During his shift on February 12, 2020, Mr. Holmes felt a sharp pain in his lower back when he bent down to pick up a bundle of pipe; the pain worsened throughout the day so he told Mr. McGovern that he needed to go to the emergency room and Mr. McGovern released him from work. (S. Holmes Decl., PAGEID # 3981–82.) The emergency room physicians diagnosed Mr. Holmes with a lower lumbar left back strain and told him to follow up with his primary care physician. (*Id.*; ECF No. 77-20.) Mr. Holmes had an appointment with his primary care physician Dr. Mark Piacentini the next day, and Dr. Piacentini prescribed a muscle relaxer and referred him to physical therapy. (S. Holmes Decl., PAGEID #3982; S. Holmes PCP Medical Rec., ECF No. 77-21, PAGEID # 2613.)

On February 18, 2020, Mr. Holmes had a follow-up appointment with Dr. Piacentini, at which time Dr. Piacentini advised him to plan to go back to work on February 21, but if he was still in pain, to "call in" that morning. (S. Holmes PCP Medical Rec., PAGEID # 2613.)

Before his shifts on February 13 and 18, Mr. Holmes called off by leaving a message on the call-off line and calling Mr. McGovern to tell him that he had doctor's appointments both days. (S. Holmes Decl., PAGEID # 3982–83.) Mr. Holmes also told Ms. Mapes via text that he had a doctor's appointment on February 13. (ECF No. 77-22, PAGEID # 2619.) After the February 13 appointment, Mr. Holmes says he called Mr. McGovern to tell him that his doctor had excused him from work through February 18. (S. Holmes Decl., PAGE ID # 3982.)

Mr. Holmes texted Ms. Mapes on February 19 that his doctor had taken him off work until February 21. He texted her again on February 21 that his doctor took him off until February 24. (ECF No. 77-22, PAGEID # 2622.) He gave Ms. Mapes the doctor's notes that excused him from work from February 12 through 23, and she forwarded them to Ms. Gutridge and Mr. Edwards. (ECF No. 73-11, PAGEID # 1685; ECF No. 73-12, PAGEID # 1687; ECF No. 77-22, PAGEID #2621–24.)

### 6.    March 17, 2020

On March 17, 2020, Mr. Holmes took A.H. to a rheumatologist appointment. (S. Holmes Decl., PAGEID # 3983; A.H. Decl., PAGEID # 3991.) He requested time off in advance as unpaid leave for this appointment. (S. Holmes Decl., PAGEID # 3983.) Ms. Mapes emailed Mr. McGovern, Mr. Edwards and Ms. Gutridge that Mr. Holmes was requesting March 17 off because his daughter had an appointment at Children's Hospital. (ECF No. 71-13, PAGEID # 1348.) Mr. Holmes says he also called both Mr. McGovern and Ms. Mapes to explain he needed to take A.H. to an appointment for her JIA. (S. Holmes Decl., PAGEID # 3983.) Defendants approved

the absence as an excused absence. (*Id.*)

### 7.    April 22, 2020

Mr. Holmes called off on April 22, 2020, because both he and A.H. were sick.
(S. Holmes Decl., PAGEID # 3984; A.H. Decl., PAGEID # 3991.) Mr. Holmes was
concerned about A.H. because it was the start of the COVID-19 pandemic and she
was immunocompromised. (S. Holmes Decl., PAGEID # 3984; A.H. Decl., PAGEID #
3991.)

Before his shift that day, Mr. Holmes texted Mr. McGovern: "Hey Nick, I'm
sorry but there is no way I can make it in today. I woke up in the middle of the
night with it coming out both ends and shit myself before I made it to the bathroom
and it's been steadily coming out ever since and now my daughter woke up with the
same shit!" (ECF No. 77-26, PAGEID # 2637.) Mr. Holmes also texted Ms. Mapes
that he was sick and not going be in, and left a message with KEG's automated call-
off line that he was not going to make it in because he had "some sort of stomach
virus or something[.]" (ECF No. 77-27, PAGEID # 2639; Tehan Aff., ECF No. 80-15,
PAGEID # 2640.)

### 8.    May 15, 2020

Finally, Mr. Holmes called off work on May 15 for his own illness and A.H.'s
illness; he says that he was up for most of the previous night monitoring and caring
for A.H. and he wanted to be careful with her condition because of the COVID-19
pandemic. (S. Holmes Decl., PAGEID # 3984; A.H. Decl., PAGEID # 3992.)

Mr. Holmes left a message with KEG's automated call-off line that he

11

wouldn't make it into work that day because he was sick. (Tehan Aff., PAGEID # 3864.) Mr. Holmes also texted Mr. McGovern that he "was not going to make it in that day." (ECF No. 77-28, PAGEID # 2641.) When Mr. McGovern asked why, Mr. Holmes responded "[i]ssues at home mostly." (*Id.*) Mr. McGovern then fired Mr. Holmes, texting that "this just isn't working anymore" and he was "going to have to let [Mr. Holmes] go." (*Id.*) Mr. Holmes then called Mr. McGovern and told him that he needed to care for A.H. because she was sick and immunocompromised; Mr. McGovern refused to reconsider the termination. (S. Holmes Decl., PAGEID # 3985.)

### E.    Mr. Holmes's Termination

On April 26, 2020, Jordan Williamson (another supervisor) had raised an issue with Mr. McGovern that Mr. Holmes had failed to prepare a building's fire suppression system; in response, Mr. McGovern told Mr. Williamson that he should fire Mr. Holmes. (ECF No. 71-15; ECF No. 71-16.) The next day, Mr. McGovern told Mr. Williamson that he was letting Mr. Holmes go but he did not say why. (ECF No. 71-19.) He also told Ms. Mapes that he was letting Mr. Holmes go and asked her to send him a list of all the dates Mr. Holmes had been off work since January 1. (ECF No. 71-17). Ms. Mapes provided the requested information to Mr. McGovern.[3] But, Mr. McGovern decided not to fire Mr. Holmes in April to "give him another chance"

---

[3] Defendants represent in their Motion that they considered all of Mr. Holmes's absences to be unexcused under KEG's policies except for those he took for his work-related injury and those for which he provided a doctor's note. (Defs.' Mot., PAGEID 2675–76.)

and because KEG needed the help. (ECF No. 71, PAGEID # 1325.)

Less than three weeks later, on May 15, Mr. McGovern fired Mr. Holmes. Mr. Holmes testified that Mr. McGovern told him that he had too many absences going back to December 2019. (S. Holmes Decl., PAGEID # 3985.) In fact, on May 18, 2020, Mr. McGovern emailed Ms. Gutridge, Mr. Edwards, and Ms. Mapes that:

> I let Shane Holmes go Friday May 15th. Shane called off Friday morning around 6:30. This was roughly his 20th call off this year. He was also let go to do [sic] to excessive tardiness. I have record [sic] of his clock in times and locations for verification.

(ECF No. 71-20, PAGEID # 1358.)

According to Mr. McGovern, his reference to "excessive tardiness" was about Mr. Holmes clocking in before he was at a job site or clocking in with his location turned off. (McGovern Dep. II, ECF No. 71, PAGEID # 1264.) He testified that Mr. Holmes had been verbally reprimanded and suspended for tardiness during his employment with KEG. (McGovern Dep. I, PAGEID # 505, 508.) But Mr. Holmes denies that he was tardy, explaining that he had a "gentlemen's agreement" with Mr. McGovern whereby he could arrive late and leave early to transport his children to and from school. (S. Holmes Dec., PAGEID # 3985.) While Mr. McGovern recalls no such agreement, (McGovern Dep. II, PAGEID # 1263–64), KEG has no written documentation of prior discipline of Mr. Holmes for tardiness or absences. (KEG Dep., PAGEID # 1509.)

### F.  Administrative Proceedings

Mr. McGovern testified before the Ohio Civil Rights Commission ("OCRC") and the Ohio Industrial Commission ("OIC") about Mr. Holmes's termination. Mr.

McGovern submitted an affidavit to the OCRC stating that:

> Mr. Holmes repeatedly failed to properly clock in and out of work, which left the Company spending a lot of time trying to determine if Holmes was actually on the job as assigned or absent. We discovered that he was actually clocking in and out of work from places other than the actual job site through our online clock in application. I made the decisions to terminate Mr. Holmes's employment, and it was my decision and my decision alone. The decision came from Mr. Holmes' repeated history of ignoring the Company's clocking in and out policies, repeated unexcused absenteeism, Mr. Holmes lying to me about his need for leave, and for missing work without a valid excuse. Specifically, I terminated Mr. Holmes on Friday, May 15, 2020 after Mr. Holmes failed to show up for work. When I did talk to Mr. Holmes about it, which was at the time he was supposed to be showing up on the job site, he told me that he was not coming to work that day because he had been up all night because his daughter—though I am not sure who in particular—ran away from home and he had been out looking for her. This absence came on the heels of a number of other leaves in April and February and also a host of other issues, including him not showing up when he would be the other person on a job site with keys to unlock tools that the workers needed. The most pressing of which was Mr. Holmes not only missing a significant amount of work in February through the termination date, but, most importantly, for lying to me about why he was taking leave on occasion.

(ECF No. 69-4, PAGEID # 792–93.)

Mr. McGovern later testified at an OIC hearing that Mr. Holmes was fired for tardiness and unexcused absences but that the February 2020 absences had "no effect on his termination." (ECF No. 69-5, PAGEID # 801–02.) He did not mention that Mr. Holmes lied about his need for leave at the OIC hearing. (*Id.*)

### G.    Mr. Holmes's Post-Termination Job Search

After his termination, Mr. Holmes applied for and received unemployment benefits. (Holmes Dep., ECF No. 80-1, PAGEID # 2700–01.) He applied for two to three jobs per week, including with sprinkler installation and landscaping

companies, until his unemployment ran out. (*Id.* at PAGEID # 2701.) In November 2021, he got a new job but it paid less than he made at KEG. (*Id.*; ECF No. 77-1, PAGEID # 1836.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that

summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

The standards on which a court evaluates motions for summary judgment "do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted).

## III.   ANALYSIS

Mr. Holmes's remaining claims are: Claim 1 that the Defendants interfered with his FMLA rights; Claim 2 that the Defendants retaliated against him by terminating him for taking FMLA-protected leave; Claim 3 that the Defendants violated the ADA by terminating him for his association with his daughter; Claim 4 that the Defendants violated Ohio law by terminating him for his association with his daughter; and Claim 5 that Mr. McGovern violated Ohio law by aiding and abetting KEG's termination of him for his association with his daughter.

Mr. Holmes moves for summary judgment on Claims 1 and 2 and on the Defendants' failure-to-mitigate affirmative defense. Defendants move for summary judgment on all five claims.

The Court will address Mr. Holmes's claims in order.

### A.      FMLA Claims

The FMLA affords up to twelve weeks of leave in one year to eligible employees "[b]ecause of serious health condition that makes the employee unable to perform the functions of the position of such employee" or to "care for [a] spouse, or a son, daughter, or parent . . . [who] has a serious health condition." 29 U.S.C. §

2612(a)(1). A claim of FMLA "interference" arises when an employer interferes with, restrains, or denies an employee's exercise of or attempt to exercise any right provided under the FMLA. 29 U.S.C. § 2615. A claim of FMLA "retaliation" arises when an employer discharges an employee because he has invoked any right provided under the FMLA. *Id.*

### 1.    Interference – Claim 1

FMLA interference can be proven by direct or circumstantial evidence. *See Render v. FCA US, LLC*, 53 F.4th 905, 919 (6th Cir. 2022). When an employee relies on circumstantial evidence,[4] the Court uses the *McDonnell Douglas* burden-shifting framework. *Id.* Under that framework, a plaintiff must first establish a *prima facie* case of interference by proving the following elements: (1) he was an FLMA-eligible employee; (2) the defendant was a covered "employer"; (3) he was entitled to FMLA leave; (4) he gave the employer notice of his intention to take leave; (5) the employer denied or interfered with the FMLA benefits to which he was entitled; and (6) the employer's violation caused him harm. *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (citing *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)).

If a plaintiff establishes each of these elements, the employer must show that it had a "legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Id.* If the employer successfully carries its burden, the

---

[4] Mr. Holmes argues that he has presented direct evidence that Defendants interfered with his FMLA rights by showing they terminated him for one or more FMLA-protected absences. But genuine issues of fact preclude a finding that Defendants terminated Mr. Holmes for FMLA-protected absences, so the Court will analyze his claim under the *McDonnell Douglas* framework.

plaintiff can show the employer's reason is pretextual by showing that the proffered reason had no basis in fact, did not actively motivate the adverse action, or was insufficient to warrant the action. *Donald v. Sybra*, 667 F.3d 757, at 762 (6th Cir. 2012) (citing *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)).

> **a.    There are genuine issues of material fact regarding Mr. Holmes's *prima facie* case.**

As to Mr. Holmes's *prima facie* case, it is undisputed that he was an eligible employee and that Defendants are employers under the FMLA. As to the third and fourth *prima facie* prongs, Mr. Holmes argues that he was entitled to FMLA-leave and gave adequate notice for 20 of his absences. As to the fifth and sixth prongs, he argues Defendants interfered with his FMLA rights by failing to designate his absences as FMLA-protected and caused him harm when they then fired him for those absences.

> **i.    FMLA Leave Entitlement**

> **1.)    Mr. Holmes was entitled to FMLA leave for his work-related injury.**

An employee is entitled to FMLA leave for a "serious health condition that makes the employee unable to perform the functions of such employee." 29 U.S.C. § 2612(a)(1)(D). A serious health condition is an "illness, injury, impairment, or physical or mental condition that involves" either "inpatient care in a hospital, hospice, or residential medical care facility; or [] continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Continuing treatment by a health care provider includes "a period of incapacity of more than three consecutive, full

calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves," among other things, "[t]reatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.115(a)(2). A person is incapacitated under the FMLA if they are unable "to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

Defendants do not dispute that Mr. Holmes's work-related back injury entitled him to FMLA leave.[5]

### 2.)  Mr. Holmes was entitled to FMLA leave for his mother's illness.

Defendants do not dispute that Mr. Holmes's mother's heart attack qualified as a serious health condition; rather, they argue that Mr. Holmes did not "care for" her to qualify him for FMLA leave. (Defs.' Mot., PAGEID # 2682–84.)

Under the FMLA, caring for a family member "encompasses both physical and psychological care" and "includes providing psychological comfort and

---

[5] Defendants argue that Mr. Holmes's February absences for his work-related back injury were not a reason for his firing. (Defs.' Mot., PAGEID # 2674.) But, as discussed below, there is a genuine issue of material fact as to whether the February absences factored into Mr. Holmes's firing—although Mr. McGovern testified to the OIC and in this case that the February absences did not play a role in his decision to fire Mr. Holmes, his May 18 email says that Mr. Holmes was fired for his 20th call off of the year, which includes the seven days he was off work in February. Mr. McGovern's OCRC testimony also indicated that these February absences contributed to his decision to fire Mr. Holmes.

reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care." *Alsoofi v. Thyssenkrupp Materials NA, Inc.*, No. 09-CV-12869, 2010 WL 973456, at *3 (E.D. Mich. Mar. 15, 2010) (quoting 29 § C.F.R. 825.124). The employee claiming FMLA leave "need not be the only individual or family member available to care for the family member[.]" *Id.* (quoting 29 § C.F.R. 825.124).

Both Mr. Holmes and his mother testified that he helped her decide on her course of treatment and provided her with emotional comfort and support when he visited her in the hospital. Defendants' only response is to argue that the testimony of Mr. Holmes and his mother is self-serving, unsupported, conclusory, and contradicted by the record. (Defs.' Response, ECF No. 83, PAGEID # 3897; Defs.' Reply, ECF No. 86, PAGEID # 4812.) But the self-serving nature of testimony, by itself, does nothing to undermine its evidentiary value under Rule 56. *See Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 841 (6th Cir. 2021) (collecting cases). And their declarations are not contradicted by undisputed evidence such that they are blatantly and demonstrably false. While Defendants point to evidence that a nurse spoke with one of Mr. Holmes's brothers on December 4, that Mr. Holmes was not at the hospital every day his mother was there, and that she went to stay with his brother when she was discharged, this evidence does not contradict the testimony that Mr. Holmes provided comfort and reassurance to his mother on December 4 and 5.

Further, to the extent Defendants argue that Mr. Holmes could not have

20

cared for his mother because his brother was at the hospital on December 4 and when she was discharged on December 10, the mere availability of another family member does not exclude Mr. Holmes from FMLA protection. 29 § C.F.R. 825.124(b).

Mr. Holmes has established he was entitled to FMLA leave on December 4 and 5.

> **3.)** **There is a genuine issue of material fact as to whether Mr. Holmes was entitled to FMLA leave for his daughter's illness.**

Mr. Holmes argues that he was entitled to FMLA leave for his absences related to A.H.'s JIA. Under the FMLA, a "serious health condition" includes any period of incapacity resulting from a "chronic serious health condition," which is a health condition that requires periodic visits for treatment at least twice a year, continues over an extended period of time, and may cause episodic rather than a continuing period of incapacity. 29 C.F.R. § 825.115(c). Absences attributable to incapacity for chronic serious health conditions are FMLA-qualifying even if the "covered family member does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three consecutive, full calendar days." 29 C.F.R. § 825.115(f). Still, the covered family member must have actually been "unable to work, attend school, or perform other regular daily activities during the period of [] leave." *Perry v. Jaguar of Troy*, 353 F.3d 510, 515 (6th Cir. 2003). It is the plaintiff's burden to show that their covered family member had a serious health condition that incapacitated them during the

period of his FMLA leave. *See id.*

There are genuine issues of material fact as to whether A.H.'s JIA incapacitated her on 8 of the days Mr. Holmes claims he was entitled to FMLA leave to care for her.[6] Mr. Holmes has presented evidence that: (i) on December 3, 2019, A.H. was in severe pain due to her JIA; (ii) on December 24, 2019, A.H. received a methotrexate injection that made her sick and Mr. Holmes needed to care for her; (iii) on December 18, January 22 and March 17, 2020, A.H. missed school due to rheumatology appointments; and (iv) on January 24, April 22, and May 15, 2020, A.H. was sick and her doctor instructed Mr. Holmes to keep her home and monitor her.

Defendants dispute that A.H.'s JIA was incapacitating; they point to evidence that indicates A.H. played softball, that her school performance and attendance were very good, that her daily activity was not limited between her appointments on December 24, 2019, and January 22, 2020, and that she did not miss school in January 2020. They argue this case is like *Perry* in which an employee failed to establish that her son was incapacitated during her leave because there was evidence that he attended school, rode bikes, swam, and played with friends. 353 F.3d at 515. But, unlike the plaintiff in *Perry*, Mr. Holmes has presented sufficient evidence for a jury to find that A.H. was unable to attend school and unable to care

---

[6] There is no evidence, however, that A.H. was incapacitated on January 23, 2020; the evidence is that Mr. Holmes was sick on that day and he called off work because he did not want to get A.H. sick—this absence does not qualify for FMLA leave.

for herself on 8 of the dates for which he sought FMLA leave.

Thus, there remains a question of fact for the jury as to whether Mr. Holmes was entitled to FMLA leave for A.H.'s illness on those 8 dates.

### ii.      Adequate Notice of Intent to Take FMLA Leave

The Court next considers whether Mr. Holmes provided Defendants with adequate notice of his intent to take FMLA leave. "'[A]n employee does not have to expressly assert his right to take leave as a right under the FMLA' to trigger its protections." *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 872 (6th Cir. 2023) (quoting *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999)). Still, "the employee must provide enough information for the employer to know that the leave she has requested reasonably might fall under the FMLA" and must indicate when "leave is needed to care for a family member[.]" *Id.* at 872. If the employer does not have enough information about the reason for an employee's use of leave, the employer "should inquire further to ascertain whether the employee's leave was potentially FMLA-qualifying." *Id.* (quoting *Nawrocki v. United Methodist Ret. Cmtys. Inc.*, 174 F. App'x 334, 338 (6th Cir. 2006)). "Once an employer is put on notice that an employee seeks to use her FMLA leave, moreover, 'the employer bears the obligation to collect any additional information necessary to make the leave comply with the requirements of the FMLA.'" *Id.* (quoting *Hammon*, 165 F.3d at 450). Here, Mr. Holmes never expressly requested FMLA leave, but he claims he provided Defendants with adequate notice to trigger their duty to inquire further.

### 1.) Mr. Holmes provided adequate notice of his FMLA leave for his work-related injury.

As to notice of Mr. Holmes's own FMLA-qualifying condition, Mr. Holmes provided doctor's notes that excused him from work from February 12 through 23, 2020. While these doctor's notes do not provide details about Mr. Holmes's medical condition, they alerted Defendants to the fact that he had a condition that rendered him unable to work for over a week. He provided adequate notice to Defendants to trigger their duty to inquire further about whether FMLA leave was being sought for his February absences. *See Reeder v. Cnty. of Wayne, Michigan*, 694 F. App'x 1001, 1006 (6th Cir. 2017) (evidence that employee provided three medical notes to employer certifying his inability to work more than 8 hours per day was enough to trigger employer's obligation to inquire further).

### 2.) Mr. Holmes provided adequate notice of his FMLA leave for his mother's illness.

While there is some dispute over whether Mr. Holmes spoke to Mr. McGovern and/or Ms. Mapes about his mother's hospitalization, it is undisputed that he texted them that his absences on December 4 and 5 were to visit his mother in the hospital due to her heart attack. This suffices to put Defendants on notice of their duty to inquire further about whether FMLA leave was being sought for those absences. *See, e.g.*, *Bryant v. Delbar Prods., Inc.*, 18 F. Supp. 2d 799, 806 (M.D. Tenn. 1998) (employee provided adequate notice of request to take leave in a potentially FMLA-qualifying situation when she told her employer on the day she needed time off that her son had been hospitalized); *Finley v. Manor Care of Kingsford, MI, L.L.C.*, No.

24

2:07-CV-236, 2008 WL 4743715, at *8 (W.D. Mich. Oct. 29, 2008) (same).

> **3.)** **There is a genuine issue of material fact as to whether Mr. Holmes provided adequate notice of his FMLA leave for his daughter's illness.**

Even assuming A.H.'s JIA was incapacitating on the dates Mr. Holmes called off to care for her, there are genuine issues of material fact as to whether he sufficiently notified Defendants of his intent to take FMLA leave for her illness—his text messages to Mr. McGovern and Ms. Mapes do not specify A.H.'s JIA diagnosis or that his absences related to her JIA. However, his texts do establish that Defendants knew that A.H. was being seen at a rheumatology clinic, that she was on medication that suppressed her immune system, and that Mr. Holmes had called off work multiple times due to her illness or her doctor's appointments, all of which could suggest to a reasonable employer that A.H. had a condition that was likely to be protected by the FMLA.

Mr. Holmes also says that he spoke to Mr. McGovern and Ms. Mapes several times about A.H.'s JIA diagnosis and her treatment. They both dispute that Mr. Holmes talked to them about his daughter. Thus, a jury must decide whether Mr. Holmes provided adequate notice as to his FMLA-qualifying absences for A.H.'s JIA.

> **iii.** **There is a genuine issue of material fact as to whether Defendants interfered with Mr. Holmes's FMLA rights.**

25

Mr. Holmes argues that Defendants interfered with his FMLA rights by failing to designate his absences as FMLA-qualifying or to inquire further, causing him harm when they terminated him for those absences.

An employer's failure to satisfy its duty to inquire further upon adequate notice of an employee's intent to take FMLA leave "may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." *Easter v. Beacon Tri-State Staffing, Inc.*, No. 2:17-CV-00197, 2019 WL 4737694, at *6 (S.D. Ohio Sept. 27, 2019) (Marbley, J.) (quoting 29 C.F.R. § 825.300). And it is undisputed that Defendants neither designated any of Mr. Holmes's absences as FMLA-leave nor inquired further to determine if the leave was FMLA-protected. Thus, Mr. Holmes has established that Defendants interfered with his FMLA rights as to his absences for his work-related injury and his mother's illness. However, as discussed above, there remains a question of fact as to whether Mr. Holmes's absences for his daughter's illness were FMLA-qualifying and whether Defendants' duty to inquire was triggered for those absences.

### iv. There is a genuine issue of material fact as to whether Defendants' interference caused Mr. Holmes harm.

Further, an employee pursuing an FMLA interference claim must establish that "the employer's violation caused [him] harm." *Edgar*, 443 F.3d at 508. As discussed below, there is a genuine issue of material fact as to which of Mr. Holmes's absences factored into Mr. McGovern's decision to fire him. If Mr. Holmes's "absences should have been certified for FMLA-protected leave, and the

26

jury finds that [he] was fired for those absences, then Defendants' alleged interference would be the proximate cause of Plaintiff's termination." *Easter*, 2019 WL 4737694, at *6. *See Wallace*, 764 F.3d at 591 (employer's failure to provide FMLA-required notice of the consequences of failing to return medical-certification form was the proximate cause of employee's termination).

### b. Defendants have offered legitimate, non-FMLA protected reasons for terminating Mr. Holmes.

Defendants claim in their summary judgment briefing that they fired Mr. Holmes because he failed to appear at work on May 15, 2020, his work was subpar, excessive tardiness, and other unexcused absences that even Mr. Holmes admits are non-FMLA-qualifying. (Defs.' Mot., PAGEID # 2685-88; *see* Pl.'s Mot., PAGEID # 1816.) These reasons are sufficient at this stage of the analysis. *Garavaglia v. George P. Johnson Project: Worldwide, Inc.*, No. 20-CV-12714, 2023 WL 3826456, at *10 (E.D. Mich. June 5, 2023), *appeal dismissed sub nom. Garavaglia v. Project: Worldwide, Inc.*, No. 23-1612, 2023 WL 9060870 (6th Cir. Nov. 8, 2023) (articulating that defendants' burden is one of production).

### c. There is a genuine issue of material fact as to whether Defendants' legitimate, non-FMLA related reasons are pretextual.

Mr. Holmes makes three arguments that Defendants' stated reasons for his termination are pretextual: (1) Defendants have changed their justifications for his termination; (2) Defendants' reasons have no basis in fact regarding his tardiness and performance issues; and (3) Defendants deviated from their progressive discipline policy for unexcused absences and tardies.

27

First, Defendants' have provided shifting justifications for Mr. Holmes's firing. Showing that the defendants' justifications for firing him changed over time, an employee "calls the credibility of those justifications into question" and "shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for [the impermissible motive]." *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 540 (6th Cir. 2014) (quoting *Cicero v. Borg–Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir.2002)). At the end of April 2020, after some internal discussion, Mr. McGovern decided not to fire Mr. Holmes. Then, when Mr. McGovern fired Mr. Holmes a few weeks later, Mr. McGovern told him he was terminated for absences going back to December 2019 (if a jury believes Mr. Holmes's testimony)—and Mr. McGovern had requested a list of the specific dates Mr. Holmes had been off work since January 1. Mr. McGovern's internal company email on May 18, 2020, said that he fired Mr. Holmes for excessive tardiness and 20 call-offs—which includes the February 2020 absences and other absences Defendants now claim were excused under KEG's policies.

Mr. McGovern has since given conflicting statements to OCRC and OIC about his reason for firing Mr. Holmes—while Defendants insist that Mr. McGovern's statements in these proceedings should be disregarded as ambiguous and unrelated to this case, a review of his statements reveal that they directly address Mr. McGovern's reasons for firing Mr. Holmes. Mr. McGovern told the OCRC that he fired Mr. Holmes for his absence on May 15, his April and February 2020 absences, and for lying to Mr. McGovern about the reason for his February 2020 absences. He

28

then testified at an OIC hearing that the February 2020 absences played no part in his decision, but that he did consider Mr. Holmes's absences before and after the February 2020 absences. Mr. McGovern never mentioned performance issues at the OCRC or OIC proceedings.

Now in this case, in interrogatory responses and at Mr. McGovern's first deposition, he testified that 11 of Mr. Holmes's absences in December 2019, January 2020, and April 2020 played a role in Mr. Holmes' termination. (McGovern Dep. I, PAGEID # 575–76; ECF No. 77-31, PAGEID # 2652.) Yet Defendants assert in their summary judgment briefing that only 5 of Mr. Holmes's absences in April and May 2020, performance issues, and excessive tardiness were the reasons Mr. McGovern terminated him. A jury could reasonably determine that this shifting of justifications is evidence that Defendants fired Mr. Holmes for his FMLA absences.

Second, Defendants conceded that Mr. Holmes had no record of discipline for tardiness. (KEG Dep., PAGEID # 1509–10.) And Mr. McGovern testified that he gave Mr. Holmes performance-based raises and let him take the lead role on certain jobs. (McGovern Dep. I, PAGEID # 591–93.) Based on these facts, a jury could determine that some or all of Defendants' justifications have no basis in fact.

Third, Defendants concede that they did not follow KEG's progressive discipline policy. (KEG Dep., PAGEID # 1509–10.) While KEG's policies arguably do not mandate progressive discipline, deviation from a company policy creates a triable issue of pretext.

The Court **DENIES** both parties' Motions as to Claim 1.

29

### 2.    Retaliation – Claim 2

An employer cannot retaliate by "'us[ing] the taking of FMLA leave as a negative factor in employment actions.'" *Hunter v. Valley View Loc. Sch.*, 579 F.3d 688, 692–93 (6th Cir. 2009) (citing 29 C.F.R. § 825.220(c)). A plaintiff can prove an FMLA retaliation claim by either direct or indirect evidence. *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 432 (6th Cir. 2014).

Mr. Holmes argues that a finding that Defendants fired him for FMLA-protected absences would constitute direct evidence of retaliation. *See Hunter*, 579 F.3d at 693 (finding that an employer's testimony that it made adverse employment decision based on an employee's excessive absenteeism, which included absences that were FMLA-protected, was direct evidence of FMLA retaliation). But as discussed above, issues of fact remain as to whether Defendants terminated Mr. Holmes for absences that were FMLA-protected. Accordingly, summary judgment on his FMLA retaliation claim is also inappropriate.

The Court **DENIES** both parties' motions for summary judgment as to Count 2.

### B.    Disability Discrimination Claims

In their summary judgment motion, Defendants argue that (1) Mr. Holmes cannot establish a *prima facie* case of associational disability discrimination and that, even if he could, they terminated him for legitimate, non-discriminatory reasons; and (2) Ohio law does not recognize associational disability discrimination claims.

### 1.    ADA Claim – Claim 3

The ADA prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Mr. Holmes proceeds under the distraction theory of associational discrimination which pertains to discrimination "based on the employee's being somewhat inattentive at work because of the disability of someone with whom he or she is associated." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011). Under this theory, "an employer may be liable for associational disability discrimination 'where it terminated an employee based on an unfounded assumption regarding the employee's need for future leave in order to care for a disabled person.'" *Easter*, 2019 WL 4737694, at *9 (quoting *Gonzalez v. Wells Fargo Bank, N.A.*, 2013 WL 5435789, at *7 (S.D. Fla. Sept. 27, 2013)). "But 'an employer's decision to terminate an employee with a disabled relative is within legal bounds where it is based on an established record of past absences, or a clear indication of the employee's intent to take additional time off to care for the disabled relative.'" *Id.* (quoting *Gonzalez*, 2013 WL 5435789, at *7).

Without direct evidence,[7] associational disability claims are analyzed under

---

[7] Mr. Holmes argues that Mr. McGovern's testimony that he fired Mr. Holmes because he could not depend on Mr. Holmes showing up at work in the future is direct evidence of discrimination because Mr. McGovern knew several of his past absences were for A.H.'s JIA. But Mr. McGovern's testimony requires an inference to conclude that the action was driven by improper motives, particularly because Mr. Holmes had multiple absences that were unrelated to A.H.'s illness.

the *McDonnell-Douglas* framework. *Stansberry*, 651 F.3d at 487. To make out a *prima facie* case of associational disability discrimination, Mr. Holmes must show that (1) he was qualified for his position; (2) he suffered an adverse employment action; (3) his employer knew that he had a relative with a disability; and (4) the circumstances of the adverse employment action raise a reasonable inference that the relative's disability was a determining factor in the decision. *Id.* at 487; *Overley v. Covenant Transp., Inc.*, 178 F. App'x 488, 493 (6th Cir. 2006). An ADA plaintiff must prove that disability was the "but for" cause of the employer's adverse action. *Sper v. Judson Care Ctr.*, Inc., 29 F. Supp. 3d 1102, 1109 (S.D. Ohio 2014) (Beckwith, J.) (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc)). For this reason, as conceded by Mr. Holmes, if he succeeds on his FMLA claims, he cannot succeed on his ADA claim. (*See* Pl.'s Response, ECF No. 84, PAGEID # 3964.)

### a. There is a genuine issue of material fact as to whether Defendants knew A.H. was disabled.

Defendants do not dispute that A.H.'s JIA qualifies as a disability under the ADA—they argue that Mr. Holmes's communications to them about A.H.'s condition were insufficient for them to know or have reason to know that she was disabled.

An employee demonstrates that his employer knew of his family member's disability if he can show that key decision-makers were aware of his family member's condition. *Gaglioti v. Levin Grp., Inc.*, 508 F. App'x 476, 484 (6th Cir. 2012). In *Gaglioti*, the Sixth Circuit found that the employer was aware that the employee's wife was disabled because a decision-maker saw that she was disabled

32

at a cocktail party, the employee spoke to a decision-maker about his wife's medical problems, and the employee submitted two medical insurance forms to the employer that disclosed information relating to his wife's medical condition. *Id.*

Mr. Holmes's texts to Mr. McGovern and Ms. Mapes and the doctor's notes he provided for A.H.'s appointments establish that Defendants knew that: (i) A.H. had multiple appointments at the rheumatology clinic; (ii) she was taking medication that lowered her immune system; and (3) on January 24, 2020, her doctor instructed Mr. Holmes to monitor A.H. when she was sick and take her to the emergency room if she got worse. Defendants concede that these communications may have put them on notice that A.H. had a health issue, but they argue that they could not have reasonably concluded from this information that she had an ADA disability. (Defs.' Mot., PAGEID # 2692.) But Mr. Holmes also testified that he discussed the details of A.H.'s JIA with Mr. McGovern and Ms. Mapes, including that severe flare-ups caused her so much pain that she could not attend school or take care of herself. Thus, a jury could find that Defendants knew that or reasonably should have known that A.H. had a disability.

> **b.    There is a genuine issue of material fact as to whether Defendants' legitimate, non-discriminatory reasons for his termination are pretext for discrimination.**

As discussed above in the context of his FMLA claims, factual disputes preclude summary judgment as to whether Defendants' legitimate and non-discriminatory reasons for terminating Mr. Holmes are pretextual.

Accordingly, the Court **DENIES** Defendants' Motion for Partial Summary

Judgment as to Claim 3.

### 2. Associational Disability Discrimination Under Ohio Law – Claim 4

Mr. Holmes brings his associational disability discrimination under Ohio law. As relevant here, Ohio Rev. Code § 4112.02(A) makes it unlawful for "any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause" or "otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." The Sixth Circuit recently concluded that this statute creates an associational disability discrimination claim. *Chapman v. Brentlinger Enterprises*, 124 F.4th 382, 406 (6th Cir. 2024).

Disability discrimination claims, whether brought under the ADA or Ohio law, are analyzed in the same manner. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007); *see also Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) ("In light of the fact that Ohio's disability discrimination law parallels the ADA in all relevant respects, we apply the same analytical framework[.]"). Accordingly, for the same reasons that the Court denies summary judgment to Defendants as to Claim 3, the Court **DENIES** Defendants' Motion for Partial Summary Judgment as to Claim 4.

### 3. Aiding and Abetting – Claim 5

Mr. Holmes brings an aiding-and-abetting claim against Mr. McGovern for his role in terminating Mr. Holmes. Ohio law makes it illegal for "any person to aid,

34

abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice." R.C. § 4112.02(J).

Because Mr. Holmes's aiding-and-abetting claim is derivative of his primary claim of discrimination under Ohio law, the Court **DENIES** Defendants' Motion for Partial Summary Judgment as to Claim 5.

### C.     Failure to Mitigate Damages – Defendants' Affirmative Defense

Mr. Holmes seeks summary judgment on Defendants' affirmative defense that he failed to mitigate his damages following his termination.

An employee's mitigation efforts is one of several factors the Court must consider when assessing damages. *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). To prove a failure to mitigate, a defendant must prove (1) there were substantially equivalent positions available and (2) the plaintiff did not use reasonable care and diligence in seeking such positions.[8] *Id.* at 557. If a defendant offers no evidence to satisfy its burden, the plaintiff has "no legal obligation to demonstrate that he sought or obtained comparable employment after his unlawful termination." *Holloway v. Dodge*, No. 1:16CV1075, 2019 WL 3891852, at *2 (S.D. Ohio Aug. 19, 2019) (Barrett, J.) (citing *Pittington v. Great Smoky Mountain*

---

[8] Defendants cite to *Gunter v. Bemis*, 906 F.3d 484 (6th Cir. 2018), for the proposition that Mr. Holmes must first prove his damages with "reasonable certainty," and they argue that Mr. Holmes has not met his burden because the calculations of the parties' damages experts are far apart. (Defs.' Response, PAGEID # 3900.) But this argument is not relevant here—Mr. Holmes's Motion challenges Defendants' failure-to-mitigate affirmative defense, and the burden of establishing that defense lies with Defendants. *See Easter*, 2019 WL 4737694, at *10.

*Lumberjack Feud, LLC*, 880 F.3d 791, 801 (6th Cir. 2018)).

Defendants have not provided evidence that there were substantially equivalent positions available. Although they point to Mr. Holmes's testimony that he applied for sprinkler installation and landscape companies after he was terminated, he also testified that he did not get any callbacks that led to a job and that employers were not hiring due to the COVID-19 pandemic.

Defendants also seek to rely on the testimony of Ms. Wilson that the "[fire suppression] industry is always hiring" and that a person with the knowledge to do sprinkler fitting or who has any sort of fire protection knowledge "can get [his] foot in the door in really any fire protection company." (KEG Dep., PAGEID # 1521.) Defendants assert that this testimony is reliable because Ms. Wilson testified that she has experience "in recruiting, interviewing, and hiring sprinkler installation technicians," (Defs.' Response, PAGEID # 3901), but there is no such testimony in the record. Even if she had this industry-specific experience, her testimony would not satisfy Defendants' burden to survive summary judgment. *Easter*, 2019 WL 4737694, at *10 (defendant's reliance on a truck driver's testimony that "truck driving positions are a dime a dozen" did not establish that substantially equivalent truck driving jobs were available).

Accordingly, the Court **GRANTS** Plaintiff's Motion for Partial Summary on the Defendants' affirmative defense of failure to mitigate.

## IV. CONCLUSION

For the reasons set forth above, Mr. Holmes's Motion for Leave to File a Sur-

36

Reply (ECF No. 88) and Motion to Consider Supplemental Authority (ECF No. 90) are **GRANTED**.

The Court **ACCEPTS** Mr. Holmes's Notice Accepting Offer of Judgment (ECF No. 65) and hereby **ENTERS** judgment against Defendants on Claims 6, 7, 8, 9, and 10.

Mr. Holmes's Motion for Partial Summary Judgment (ECF No. 77) is **GRANTED in part** and **DENIED in part** and Defendants' Motion for Partial Summary Judgment (ECF No. 80) is **DENIED**.

The Court will set a trial on Mr. Holmes's remaining claims by separate order.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**